# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EDWARD ROSS,

     Plaintiff,                             CASE NO. 24-CV-11766

v.                                       HON. ROBERT J. WHITE

CITY OF TROY;

PETER HULLINGER, Individually and in
his Official Capacity as the Troy Fire Department Fire Chief;

MARK MILLER, Individually and in his Official Capacity
as the former Troy City Manager;

ROBERT BRUNER, Individually and in his Official Capacity
as the former Assistant City Manager and Acting City Manager,

     Defendants.

---

THE CORTESE LAW FIRM, PLC
Nanette L. Cortese (P43049)
*Attorney for Plaintiff*
30200 Telegraph Rd., Ste. 400
Bingham Farms, MI 48025
(248) 593-6933 / (248) 487-9494
ncortese@thecorteselawfirm.com

ROSATI, SCHULTZ, JOPPICH
& AMTSBUECHLER, PC
Carlito H. Young (P61863)
Michael T. Berger (P77143)
*Attorneys for Defendants*
27555 Executive Dr., Ste. 250
Farmington Hills, MI 48331
(248) 489-4100 / (248) 489-1726
cyoung@rsjalaw.com
mberger@rsjalaw.com

---

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, the City of Troy, Peter Hullinger, Mark Miller, and Robert Bruner, move for summary judgment, pursuant to Fed. R. Civ. P. 56. In support of their motion, Defendants rely on the attached brief. The undersigned sought concurrence with Plaintiff's counsel regarding this matter in person on January 22, 2026, and in email following the in-person conference, but concurrence could not be obtained.

Respectfully submitted,

ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC

/s/ Michael T. Berger
MICHAEL T. BERGER (P77143)
Attorneys for Defendants
27555 Executive Drive, Suite 250
Farmington Hills, MI 48331
(248) 489-4100 / Fax: (248) 489-1726
Date: January 30, 2026          mberger@rsjalaw.com

1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EDWARD ROSS,

  Plaintiff,         CASE NO. 24-CV-11766

v.               HON. ROBERT J. WHITE

CITY OF TROY;

PETER HULLINGER, Individually and in
his Official Capacity as the Troy Fire Department Fire Chief;

MARK MILLER, Individually and in his Official Capacity
as the former Troy City Manager;

ROBERT BRUNER, Individually and in his Official Capacity
as the former Assistant City Manager and Acting City Manager,

  Defendants.

_____

| | |
|---|---|
| THE CORTESE LAW FIRM, PLC | ROSATI, SCHULTZ, JOPPICH |
| Nanette L. Cortese (P43049) | & AMTSBUECHLER, PC |
| *Attorney for Plaintiff* | Carlito H. Young (P61863) |
| 30200 Telegraph Rd., Ste. 400 | Michael T. Berger (P77143) |
| Bingham Farms, MI 48025 | *Attorneys for Defendants* |
| (248) 593-6933 / (248) 487-9494 | 27555 Executive Dr., Ste. 250 |
| ncortese@thecorteselawfirm.com | Farmington Hills, MI 48331 |
| | (248) 489-4100 / (248) 489-1726 |
| | cyoung@rsjalaw.com |
| | mberger@rsjalaw.com |

_____

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INDEX OF AUTHORITIES .................................................................... iv

MOST CONTROLLING AUTHORITY ..................................................... vii

ISSUES PRESENTED .......................................................................... vii

INTRODUCTION .................................................................................. 1

STATEMENT OF FACTS ....................................................................... 2

PROCEDURAL HISTORY ..................................................................... 12

STANDARD OF REVIEW ...................................................................... 12

LAW & ARGUMENT – THE INDIVIDUALS ............................................ 13

    I.  Edward Ross's claim against Chief Hullinger fails because he has no First Amendment right to run for office and his termination had nothing to do with Edward Ross's alleged protected speech. ............................................... 20

        a.  Edward Ross cannot establish a claim related to his first run for office because running for office is not protected by the First Amendment, nor did Edward Ross suffer any termination or other adverse action when he ran for office the first time. ..................................................................... 20

        b.  Edward Ross's claim relating to his second run for City Council fails because there is no First Amendment right to run for office and his termination was unrelated to any protected speech. ................................................. 21

    II.  Former City Manager Mark Miller and Deputy City Manager Bob Bruner were not personally involved with the actions that Edward Ross claims were unconstitutional. ................................................................................ 23

    III. The Official Capacity Claims should be dismissed as duplicative of the claims against the City. ................................................................................. 23

LAW & ARGUMENT – THE CITY ......................................................... 24

    I.  Ross's claim against the City should be dismissed because its policies and procedures are constitutional – there is no First Amendment right to run for office ............................................................................................... 24

CONCLUSION ........................................................................................................... 25

CERTIFICATE OF SERVICE ..................................................................................... 25

# INDEX OF AUTHORITIES

*Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................ 13

*Ashford v. Raby*, 951 F.3d 798 (6th Cir. 2020) ...................................................................... 14

*Bagi v. City of Parma, Ohio*, 714 F. App'x 480 (6th Cir. 2017) ...................................... 16, 22

*Carver v. Dennis*, 104 F.3d 847 (6th Cir. 1997) ...........................................................17, 21, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 13

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) ............................................................. 13

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ................................................................ 24

*Cooper v Parrish*, 203 F3d 937 (6th Cir. 2000) ..................................................................... 14

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) ....................................................................... 15

*Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017) ........................................................................ 16

*Golembiewski v. Logie*, 516 F. App'x 476 (6th Cir. 2013) ................................................ 16, 22

*Gragg v. Somerset Tech. Coll.*, 373 F.3d 763 (6th Cir. 2004) ........................................... 16, 21

*Heyne v Metro Nashville Pub Sch*, 655 F3d 556 (6th Cir. 2001) ........................................... 14

*Johnson v Moseley*, 790 F3d 649 (6th Cir. 2015) ................................................................... 14

*Kentucky v. Graham*, 473 U.S. 159 (1985) ............................................................................. 23

*Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007) ........................................ 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................. 13

*Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499 (6th Cir. 2025) .............................................................................................................................. 15

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) .............................. 24

*Nwaebo v Hawk-Sawyer*, 83 F App'x 85 (6th Cir. 2003)........................................................ 14

*Pearson v. Callahan*, 555 U.S. 223 (2009)......................................................................... 14

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ............................................................ 24

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968) ...................................................................................................................... 15

*Rivas-Villegas v Cortesluna*, 595 U.S. 1 (2021) ................................................................. 14

*Sensabaugh v. Halliburton*, 937 F.3d 621 (6th Cir. 2019) .........................................15, 18, 19

*Strouss v Mich. Dep't. of Corr.*, 250 F. 3d 336 (6th Cir. 2001)................................................ 19

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ........................................................... 18

*Van Compernolle v. City of Zeeland*, 241 F. App'x 244 (6th Cir. 2007) ........................16, 21

*Williams v. City of Saginaw*, No. 00-10241-BC, 2002 W.L. 1798907 (E.D. Mich. August 6, 2002)...................................................................................................................... 23

**Statutes**

42 U.S.C. § 1983 .........................................................................................1, 13, 24

**Rules**

Fed. R. Civ. P. Rule 56(a) ................................................................................. 12

## MOST CONTROLLING AUTHORITY

*Carver v. Dennis*, 104 F.3d 847 (6th Cir. 1997)

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)

*Pearson v. Callahan*, 555 U.S. 223 (2009)

*Sensabaugh v. Halliburton*, 937 F.3d 621 (6th Cir. 2019)

**ISSUES PRESENTED**

I.   Whether Chief Hullinger should be dismissed from this case because he did not violate Ross's First Amendment rights and/or he is entitled to qualified immunity for his action?

Defendants state          "Yes"

Plaintiff states          "No"

II.   Whether Former City Manager Mark Miller and Deputy City Manager Bob Bruner should be dismissed from this case because they did not personally participate in the alleged unconstitutional action, they did not violate Ross's First Amendment rights, and/or they are entitled to qualified immunity?

Defendants state          "Yes"

Plaintiff states          "No"

III.   Whether Plaintiff's official capacity claims should be dismissed as duplicative of the claims against the City?

Defendants state          "Yes"

Plaintiff states          "No"

IV.  Whether the City should be dismissed because the individual Defendants did not violate Ross's constitutional rights and the policies Ross challenges are facially compliant with the First Amendment?

Defendants state     "Yes"

Plaintiff states     "No"

## INTRODUCTION

The City of Troy maintains a volunteer fire department that Plaintiff, Edward Ross, was a member of for just over four years before being terminated. The City had a formalized incentive plan for its volunteer firefighters that provided financial remuneration for those who achieved certain milestones of service. Unfortunately, the IRS identified significant tax implications that required the City to modify the plan.

Ross did not agree with the changes and ran for City Council twice because he felt the City was not listening to opposition to the change. His actions violated City policy, which barred volunteer firefighters from holding a firefighter position while simultaneously running for or holding City office. Despite this, Ross refused to resign from his volunteer position or withdraw from his 2023 campaign. However, he happened to be on medical leave during that campaign, so the City took no action. He lost that campaign and returned to his position. He ran for City Council again in 2024 and was not on medical leave that time. He again refused to step down  as a volunteer firefighter or withdraw from his campaign, so the Fire Chief terminated him.

Ross sues the City, the Fire Chief, the Deputy City Manager, and the former-City Manager under 42 USC § 1983, claiming he was retaliated against for his City Council candidacy, in violation of the First Amendment. The Court should grant summary judgment in Defendants' favor because the First Amendment does not give anyone the right to run for office. Also, Ross was not terminated for his comments, but even assuming he had been, his comments were not "protected speech."

## STATEMENT OF FACTS

Ross is a software engineer who lives in the City of Troy. (Ex. 1 – Ross Dep, p 6, 9). The City maintains a volunteer fire department, which Ross decided to join because he wanted to give something back to the community. (Ex. 1 – Ross Dep, p 10-11). On February 13, 2019, he applied for a position with the fire department and was offered a volunteer firefighter position. (Ex. 2 – Volunteer Offer).

The City maintained an incentive plan for their firefighters, which provided long-term firefighters with a monetary benefit upon their "retirement" from the department. (Complaint – ECF No. 1, PageID.2). At the time Ross accepted the volunteer firefighter position, he was unaware of this plan or any financial incentives the City provided its firefighters, but he learned about it by late 2020. (Ex. 1 – Ross Dep, p 12-13).

Over the first few years of firefighting, Ross received several counseling sessions. On June 1, 2019, while Ross was a probationary member, he was counseled for having a beard (firefighters are supposed to be cleanly shaven to facilitate masks), which affected his safety. (Ex. 3 – 6/1/19 Incident Report). On January 30, 2020, Ross was counseled regarding a very loud disagreement with another department member and was informed that "any other occurrence of this type could result in a more strict correction." (Ex. 4 – 1/20/2020 Incident Report). A month later, Ross was one of a few volunteers that had to be counseled by the Fire Chief about ethical issues. (Ex. 5 – 2/8/2020 Incident Report).

2

In 2022, Peter Hullinger became the City's Fire Department Chief. (Ex. 6 – Hullinger Dep, p 10). The then City Manager, Mark Miller, hired him, but Chief Hullinger directly reported to the Deputy City Manager, Bob Bruner. (Ex. 6 – Hullinger Dep, p 10; Ex. 7 – Bruner Dep, p 7-10). Chief Hullinger's job duties included taking responsibility for all facets of the fire department, firefighting, fire suppression, responding to 911 cases, budgeting, and administrative matters. (Ex. 6 – Hullinger Dep, p 11). The fire department also has the option to discipline its volunteers as well as career fire staff, which is a discretionary decision. (Ex. 6 – Hullinger Dep, p 46). The ultimate responsibility of discipline, including termination, fell on Chief Hullinger. (Ex. 6 – Hullinger Dep, p 46).

During Chief Hullinger's tenure, the City learned that its unique incentive plan had dire tax consequences for it and the individuals in the plan. (Ex. 6 – Hullinger Dep, p 13-14, 26). In January 2023, the City announced that it would close the current incentive plan and start a new one which, in Ross's view, was a downgrade. (Complaint – ECF No. 1, PageID.2; Ex. 6 – Hullinger Dep, p 27).

Ross became upset with the change and became outspoken about it. (Complaint – ECF No. 1, PageID.2). He started a slack channel (i.e., private messaging channel) for firefighters and retired firefighters (not City administration) to discuss the change, posted on social media about his opposition to the change, spoke to several newspapers about the change, and was interviewed about the change on a radio show. (Complaint – R. 1, PageID.2-4; Ex. 1 – Ross Dep, p 21-22; Ex. 6 – Hullinger Dep, p 70). Following

Ross's appearance on the radio, with the City Mayor, an email chain was exchanged between Bruner, Miller, and Chief Hullinger about the show. (Ex. 8 – WJR Email). Bruner wrote to Hullinger and Miller that he felt Ross was trying to "pin the tail" on one of them. (Ex. 7 – Bruner Dep, p 34-35). Bruner felt it was wrong that Ross was trying to blame Chief Hullinger or Miller for the issues with the incentive plan because they were both blameless for the situation. (Ex. 7 – Bruner Dep, p 36).[1]

On February 15, 2023, Ross sent an email to the City Council opposing the changes. (Ex. 10 – 2/15/23 Ross Email).

In February and the beginning of March 2023, Ross made comments about the volunteer incentive plan on Facebook or social media, but none of those comments violated any City policy, in Chief Hullinger's opinion. (Ex. 6 – Hullinger Dep, p 61; Ex. 11 – Incident Report 3/2/23 Hullinger). Chief Hullinger, however, heard concerns within the department that Ross's online positions were being portrayed as Ross speaking on behalf of the entire department, when the reality was that the firefighters had a collective group to speak on their behalf called the Firefighter Incentive Committee. (Ex. 6 – Hullinger Dep, p 65). District Chief Phil Thor attempted to schedule a face-to-face meeting to remind Ross that there were policies that he should comply with. (Ex. 6 – Hullinger Dep, p 61; Ex. 11 – Incident Report 3/2/23). On March 2, 2023, District Chief Thor documented that he attempted to set up a face-to-

---

[1] Miller has no recollection of listening to the show. (Ex. 9 – Miller Dep, p 25).

face meeting with Ross regarding policy issues, but Ross had not responded to two phone calls (including voicemails) nor an email requesting the meeting. (Ex. 11 – Incident Report 3/2/23).

Around April 3, 2023, Ross sent a text message to the City's Mayor, opposing the change in the incentive plan. (Ex. 12 – Ross 4/3/23 Text Message). He stated

> Obviously I won't burn down your flower beds. But I guarantee if the city council votes for this new plan, you will not win the next election,. And neither will Edna, Theresa, nor Ann. You will lose, and we will put In people that will get, the Job done. If you don't believe me, ask around... I chased Henderson, and I got that school bond passed. I won't take credit for you beating him, but I chased him off social media for you. Defeating someone that tanked the fire department Is a slam dunk. You and your colleagues will be running against firefighters next time. I was a whistle-blower in Kabul, I've interviewed with SIGAR, This Is child's play. There are people on the station 9 years that were looking to get 75k In 6 months that just got magically vested, got 38k, and in 6 months will get 3650. That 75k number at 10 years is not going to be a winning strategy. It's a vapor cloud. You can do the easy thing and roll the dice or grab the spotlight and be a hero and be bold, Blow this disaster of a plan up, take all of the credit, and do what you know Is right. Or don't. But you will not win if you mess this up.

(Ex. 12 – Ross 4/3/23 Text Message). This message was forwarded to Chief Hullinger, who read it and believed it had some concerning undertones. (Ex. 6 – Hullinger Dep, p 28). He was concerned with Ross indicating that he had intimidated people before and that he was attempting to intimidate the Mayor. (Ex. 6 – Hullinger Dep, p 29-30).

On April 17, 2023, the City held a City Council meeting where it held public comment about whether it should adopt a resolution changing the incentive plan. See

April 17, 2023 City Council Meeting < https://www.youtube.com/watch?v=efak_U-Vmxo > (last accessed February 27, 2025). Ross, as well as several others, made public comment opposing the changes. *Id.* Following public comment, the City Council voted to close out the existing Volunteer Fire Fighter Incentive Plan and created a new one without the significant tax ramifications. *Id.*

In response, Ross decided to run for City Council because he felt the current members were not listening to the firefighters. (Ex. 1 – Ross Dep, p 32-33). He filed his application on July 18, 2023, and was on medical leave from the department when he decided to run for office. (Complaint – ECF No. 1, PageID.3; Ex. 6 – Hullinger Dep, p 34-35; Ex. 13 – 1st Application). When he applied, the City had a fire department policy, issued in 2011, that stated, "no active member of the fire department shall seek, be elected to, or hold any elective position within the government of the City of Troy." (Ex. 14 – 2011 Policy).

Chief Hullinger learned about Ross's decision and consulted the City Attorney and Bruner. (Ex. 6 – Hullinger Dep, p 18-19). This was a new situation for him, as he was unaware of any firefighter deciding to run for office before. (Ex. 6 – Hullinger Dep, p 39). During the discussion, it was determined that Ross's application violated the policy and because of that Chief Hullinger wrote Ross a letter indicating that Ross could not hold his volunteer position and run for office at the same time. (Ex. 6 – Hullinger Dep, p 19, 23; Ex. 15 – 7/24/2023 Letter). In response, Ross refused to resign from

the fire department or withdraw from the City Council race. (Complaint – ECF No. 1, PageID.3; Ex. 1- Ross Dep, 35-40; Ex. 6 – Hullinger, p 33-34).

After receiving the Chief's letter, Ross also retained legal counsel. His legal counsel wrote a letter to the City, dated August 15, 2023, claiming that the "Fire Department cannot demand of Mr. Ross that he relinquish his campaign for City Council, which is an exercise of his rights under the First Amendment." (Ex. 16 – 8/15/2023 Letter). Ross's campaign continued after his counsel sent that letter. He did not lose his volunteer position because he was on medical leave. (Ex. 1 – Ross Dep, p 39-41, 43; Ex. 6 – Hullinger Dep, p 34-35). However, Ross lost the election that November. (Ex. 1 – Ross Dep, p 39-41, 43).

On November 25, 2023, Ross posted on NextDoor that he was trying to ensure he had up-to-date contact information for retired firefighters and spouses of retired firefighters, or those who passed away. (Ex. 17 – 12/5/23 Text re: Nextdoor Post). On December 5, 2023, District 5 Chief Phil Thor forwarded that information to Chief Hullinger. (Ex. 6 – Hullinger Dep, p 81; Ex. 17 – 12/5/23 Text re: Nextdoor Post). Chief Hullinger had no concerns with Ross's post. (Ex. 6 – Hullinger Dep, p 82).

After Ross lost the election and healed from his medical condition, he returned to his volunteer position with the fire department but immediately had an issue. (Ex. 1 – Ross Dep, p 43-44). On February 3, 2024, he had an incident at a monthly Recruitment and Retention committee meeting. (Ex. 18 –Incident Report 2/5/23; Ex. 19 – Thor Dep, p 15). During the meeting, Ross made some comments that were

7

interpreted as "bad mouthing" another lieutenant. (Ex. 19 – Thor Dep, p 15). Ross and the lieutenant stood up as if they were going to have physical contact with each other, but station members stepped in to prevent an altercation. (Ex. 19 – Thor Dep, p 15-16). On February 5, 2024, District 5 Chief, Phil Thor had a discussion with Ross regarding the incident, where Ross "acknowledged that his actions were inappropriate and he [would] not allow it to happen again." (Ex. 18 –Incident Report 2/5/23).

On March 1, 2024, Chief Hullinger checked with Deputy Chief Shawn Hugg about whether Ross was still the Station 5 representative for the recruitment and retention committee. (Ex. 20 – 3/1/24 Email). He heard about the "altercation" and understood it got to the point where the situation was on the verge of becoming physical. (Ex. 6 – Hullinger Dep, p 84). Chief Hullinger was checking to see whether Ross was still on the committee after the altercation. (Ex. 6 – Hullinger Dep, p 33). Deputy Chief Hugg informed Chief Hullinger that a different person would represent Station 5. (Ex. 20 – 3/1/24 Email).

Late in March 2024, the City Clerk, Aileen Dickson, decided to update the City's Administrative Memorandum entitled "Regulation of Political Activity – City Personnel and Resources." (Ex. 21 – Dickson Dep, p 9-10, 12, 14; Ex. 22 – Admin Memo 3/27/24). The Clerk's duties included administering elections, and she ran into problems during the 2020 election, which had been a very emotional presidential election. (Ex. 21 – Dickson Dep, p 12-16). Clerk Dickson wanted the memorandum to provide clarity for her office ahead of the 2024 election. (Ex. 21 – Dickson Dep, p 12-

16). The prior memorandum did not answer all the questions and issues that her office was presented with during that election. (Ex. 21 – Dickson Dep, p 15-16). So, she attempted to draft the memorandum in a manner that would answer the questions that the people of Troy and City staff would have. (Ex. 21 – Dickson Dep, p 16). In relevant part, the memorandum was updated to state that "[t]his policy prohibits all City of Troy personnel from… [f]iling/apply as a candidate for or holding an elective City of Troy municipal office." (Ex. 22 – Admin Memo, Def 124). "Personnel [was] defined as any individual who is employed by, contracted to, or serves as a volunteer." (Admin Memo, Def. 123). The policy "applie[d] to all personnel during active status, inactive status, and 'on leave' status for whatever reason." (Ex. 22 – Admin Memo, Def. 123).

The fire department updated its political activity policy to reflect the updated administrative memorandum. (Ex. 23 – Hugg Dep, p 29). Chief Hullinger, along with his Deputy Chiefs, updated the fire department's political activity policy to be consistent with the City's Administrative Memorandum (Ex. 6 – Hullinger Dep, p 42; Ex. 24 – FD Policy 1003). Chief Hullinger felt updating the fire department's policy in response to the Administrative Memorandum was a good idea because, in his view, it would be a conflict of interest for a paid employee of the City or volunteer with the City to hold political office in the City. (Ex. 6 – Hullinger Dep, p 42-43).

On March 28, 2024, Chief Hullinger emailed the entire department to provide it with updates regarding the Fire Department's Political Activity policy. (Ex. 25 –

3/28/24 Emails). Ross replied to the email and included the entire Fire Department. (Ex. 25 – 3/28/24 Emails). He stated

> "As my attorney stated once before, and will once again, for me or and anyone else deciding to exercise their first amendment right to free expression under the US constitution… The prohibition under Department Policy against seeking public office is broader than State law and City Charter. Further, this constitutes a substantial infringement upon their rights under the First Amendment to the United States Constitution. It is our position that the City of Troy and the City of Troy Fire Department cannot demand to anyone that they relinquish their campaign for City Council, which is an exercise of their rights under the First Amendment to the United States Constitution. I know, that's a lot of legal jargon…"

(Ex. 25 – 3/28/24 Emails).

Chief Hullinger and Deputy Chief Hugg felt that the manner Ross handled the situation was inappropriate, though they had no issue with Ross's specific statements. (Ex. 6 – Hullinger Dep, p 50-58, 84-85; Ex. 23 – Hugg Dep, p 34-36). The fire department is set up in a para-military structure, which means that it has a chain-of-command and that communications are supposed to flow through the lower ranks to the higher ranks, then to the top. (Ex. 6 – Hullinger Dep, p 84-85; Ex. 23 – Hugg Dep, p 32-36). Thus, if Ross "had an issue with the policy, that should have been managed through the ranks," in that Ross should have taken his concerns up through the chain-of-command. (Ex. 6 – Hullinger Dep, p 51).

In spring 2024, a sitting City Council member left, which required the City to have a special election for the vacant position. (Ex. 1 – Ross Dep., p 44). Ross decided

to run for that position again, filing the appropriate paperwork on April 16, 2024. (Ex. 26 – 2nd Application). Chief Hullinger learned about Ross's decision and discussed the issue with Deputy Chief Hugg, Clerk Dickson, Bruner, and Miller. (Ex. 6 – Hullinger Dep, p 35, 40). He decided to write another letter to Ross and discussed the formatting and contents with those persons, as well as discussed with Miller and Bruner how the political activity policy applied to Ross. (Ex. 6 – Hullinger Dep, p 36-40).

Once it was determined that Ross's actions violated the City's policy, Chief Hullinger ultimately decided that he had no other option but to terminate Ross, if Ross did not withdraw his name from the City Council race. (Ex. 6 – Hullinger Dep, p 46-47). Accordingly, Chief Hullinger wrote Ross a letter indicating that since Ross was not resigning from the Fire Department during his candidacy nor withdrawing his political application, he was terminated from his volunteer position. (Ex. 27 – 5/1/2024 Letter). Chief Hullinger did not need Bruner's permission  to send the letter, but they had a discussion  beforehand so that Bruner could be kept in the loop. (Ex. 7 – Bruner Dep, p 51-53). The Chief did not seek or need Miller's approval either. (Ex. 9 – Miller Dep, 48-49).

Chief Hullinger checked with Clerk Dickson about whether Ross was still running for council or whether he withdrew his application. (Ex. 6 – Hullinger Dep, p 36). When Ross did not withdraw, Chief Hullinger terminated him during a face-to-face meeting. (Ex. 1 – Ross Dep, p 49-50). Many factors went into the Chief's decision: Ross had shown a blatant disregard for department policy by not withdrawing, he had been

part of a fire class that had several issues, he had several documented issues over the years, he recently almost had an altercation with another firefighter, and he demonstrated his insubordination when he blasted off an email to the entire Fire Department regarding his opposition to the City's change in policy, instead of opposing the issue through the chain-of-command. (Ex. 6 – Hullinger, p 48, 50, 67-68, 86-87, 95). Chief Hullinger was also concerned that Ross was disruptive in the fire department community because he received comments from volunteers and retirees expressing that Ross undermined the incentive committee during the changes in the incentive plan. (Ex. 6 – Hullinger Dep, p 85-86).

## PROCEDURAL HISTORY

On July 9, 2024, Ross filed this action against the City, Chief Hullinger, Miller, and Bruner, claiming they violated his First Amendment rights. (Complaint – ECF No. 1). Ross claims that he had a First Amendment right to run for office and that Chief Hullinger violated it by terminating him. (Ex. 1 – Ross Dep, p 55-57). He asserts that Miller violated that right by being involved in the process of drafting the amended City political activity policy. (Ex. 1 – Ross Dep, p 57). He claims that Bruner violated his rights after Miller retired, since when Bruner was interim City Manager, he failed to revoke the political activity policy. (Ex. 1 – Ross Dep, p 57-58).

## STANDARD OF REVIEW

Summary judgment, under Rule 56(a), should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." A genuine issue of material fact is defined as sufficient evidence for the trier of fact to find for the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court should enter judgment as a matter of law for the moving party if the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to demonstrate that there is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (1986). The non-moving party must set forth specific facts to support their allegations and must present more than a "mere scintilla" of evidence. *Matsushita*, 475 U.S. at 586.

## LAW & ARGUMENT – THE INDIVIDUALS

Ross seeks relief through 42 U.S.C. § 1983, which creates liability for any person who acts under the color of law and deprives an individual of his rights, privileges, and immunities secured by the Constitution. He faces an uphill battle to show the individual defendants violated his constitutional rights, or that they are not entitled to qualified

immunity. *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020); *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). Qualified immunity protects governmental officials from reasonable factual mistakes and from reasonable misjudgments in a legal standard. *Ashford*, 951 F.3d at 801. It is a two-pronged inquiry, asking: (1) whether the facts show the official violated the plaintiff's constitutional right and (2) whether the right was clearly established, and the conduct of the defendant clearly violated the established constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 229 (2009).

For the first prong, a plaintiff must demonstrate that the defendant-official was personally involved with the alleged deprivation of a constitutional right. *Nwaebo v Hawk-Sawyer*, 83 F App'x 85, 86 (6th Cir. 2003); *Cooper v Parrish*, 203 F3d 937, 951 (6th Cir. 2000). Thus, each official's actions are analyzed separately from the other officials to determine whether his or her actions rise to a constitutional violation. *Heyne v Metro Nashville Pub Sch*, 655 F3d 556, 564 (6th Cir. 2001).

For the second prong, the right at-issue must be defined "in light of the specific context of the case, not as a broad general proposition." *Johnson v Moseley*, 790 F3d 649, 654 (6th Cir. 2015). The plaintiff must identify "then-existing precedent" that put the official on notice that his/her conduct was illegal – the standard is so high that it must be "beyond debate" that the officer's conduct violated the Constitution. *Rivas-Villegas v Cortesluna*, 595 U.S. 1, 8 (2021); *Ashford*, 951 F.3d at 801.

In this case, Ross brings a First Amendment retaliation claim against three individual defendants.[2] To demonstrate that he was retaliated against for exercising this right, Ross must prove: (1) he engaged in protected speech, (2) adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was motivated in at least part by the protected conduct. *Sensabaugh v. Halliburton*, 937 F.3d 621, 628 (6th Cir. 2019).

When it comes to protected speech, the core value of the Free Speech Clause is that the public has an interest in having free and unhindered debate on matters of public importance. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 573 (1968). The First Amendment's protections extend to public officials making statements on matters of public concern. *Id.* at 574. However, the state is afforded great leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). Thus, to determine whether the speech of someone who serves the public, such as a volunteer, is protected the Courts must assess: (1) whether the speech addressed a matter of public concern; (2) if so, the court must balance the interest of the plaintiff's commenting on the matter of public concern as compared to the defendant-entity's ability to promote efficiency of the public services it performs, and (3) whether the plaintiff's speech was

---

[2] This Amendment is made applicable to the States through the Fourteenth Amendment. *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 507 (6th Cir. 2025).

substantially or the motivating factor of the decision to take the adverse action. *Id.*

For example, complaints regarding compensation typically are not speech on a matter of public concern because that is personal in nature. *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767 (6th Cir. 2004) (requesting overtime pay for additional work was purely personal in nature); *Van Compernolle v. City of Zeeland*, 241 F. App'x 244, 245 (6th Cir. 2007) (finding that a police officer's efforts to advance concerns about overtime compensation, retirement benefits, and personal disciplinary grievances of other officers could "only be characterized as internal personnel disputes."). Likewise, complaints about internal policy issues are not matters of public concern. *Bagi v. City of Parma, Ohio*, 714 F. App'x 480, 486 (6th Cir. 2017) (finding that a letter complaining that a promotion test would not be fairly administered was an employee beef, not a subject of general interest and of value and concern to the public); *Golembiewski v. Logie*, 516 F. App'x 476, 477 (6th Cir. 2013) (holding that an employee who petitioned her university to rescind a new attendance policy did not speak on a matter of public concern).

In situations where a plaintiff addressed matters of public concern, the disruptiveness of the speech in the workplace can outweigh any value the expression may have and, therefore, mean that the speech was not protected. *Id.* at 593. Entities set up in a paramilitary structure, such as correctional facilities, are provided even greater leeway in regulating speech and are provided deference in their regulation of speech. *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017). Such agencies may regulate speech that they reasonably believe would disrupt the office, undermine authority, and

destroy close working relationships. *Id.* For example, when correctional officers posted a memo notifying their fellow officers about their right to union representation during an investigation, the memorandum was not protected speech because it did not touch on a matter of public concern and the correctional facility had an interest in obtaining compliance from its correctional officers during the investigation. *Id.* at 681.

In this case, Ross contends his right to run for public office was a matter of free speech. However, "The First Amendment does not in terms confer a right to run for public office." *Carver v. Dennis*, 104 F.3d 847, 850-851 (6th Cir. 1997). In *Carver*, Denise Carver worked as a deputy clerk for Jackson County, Tennessee. *Id.* at 484. She decided to run against her boss, the County Clerk, Mildred Dennis. *Id.* After that decision, Dennis laid Carver off for a month and then replaced her one month later. *Id.* The Sixth Circuit assessed whether Carver "had a First Amendment right to run against the incumbent clerk in the next election and still retain her job." *Id.* at 849. It recognized the Supreme Court has determined that the First Amendment protects employees from being terminated based on their "political beliefs" or "political affiliations." *Id.* at 850. However, that protection did not apply to Carver because the issue was whether she had a First Amendment right to political candidacy, to which the Sixth Circuit found that she did not. *Id.* at 850-851. The case was dismissed because "Dennis's discharge of Carver did not implicate Carver's First Amendment rights." *Id.* at 853.

For something to be "adverse action," the action must be so bad that it "would chill or silence a 'person of ordinary firmness' from future First Amendment activities."

*Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999). "[C]ertain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* at 398. Put differently, it is not true that "every action, no matter how small, is constitutionally cognizable" – there is "a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* at 396. The term "adverse action" in the employment setting is drawn from employment law cases and includes "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). On the other hand, a letter of reprimand does not amount to "adverse action." *Sensabaugh*, 937 F.3d at 629.

To establish causation, the plaintiff must demonstrate that his/her speech was a *substantial or motivating* factor in an adverse employment action. *Sensabaugh*, 937 F.3d at 629. "A 'motivating factor' is essentially but-for cause…" *Id.* Temporal proximity alone is rarely, if ever sufficient to establish causation *Id.* A plaintiff must provide some sort of other indicia of retaliatory conduct to establish causation. *Id.*

Take *Sensabaugh* for instance. In that case, Crocket High Football Coach Sensabaugh visited an elementary school within his team's School District. *Id.* at 624. He took a picture and made a post on Facebook decrying the condition of the elementary school. *Id.* "Upon seeing the post, the elementary school principal contacted the district's Director of Human Resources, Susan Kiernan; the principal relayed his

concern that the posts might violate the law or school policy because the school might not have obtained parental consent to show the students' faces." *Sensabaugh v. Halliburton*, 937 F.3d 621, 625 (6th Cir. 2019). This information was relayed to the High School Director, Halliburton, and High School Principal, Wright." *Id.* Halliburton left a message? wanted to? requesting that the Coach remove the photos with the children's faces, but the Coach did not answer the phone. *Id.* Administration made more efforts to discuss the issue, but the Coach yelled at the administrators and refused to remove the posts. *Id.* The Coach was issued a Letter of Reprimand which recounted the incidents leading up to the issuance and he was placed on administrative leave pending an investigation. *Id.* The investigation resulted in a recommendation of termination due to his unprofessional conduct when the Facebook issue initially came up, insubordination, and some concerns with the Football team, like practicing injured players. *Id.* at 627. The coach was terminated. *Id.*

The Sixth Circuit found a lack of causal connection between the Facebook posts and the Coach's termination. The termination occurred about six months after the Facebook posts. *Id.* at 630. There was also evidence of other misconduct. *Id.* There simply was no evidence connecting the Facebook posts to the termination. *Id.*

Furthermore, in relation to causation, "a significant gap in time between the protected activity and the adverse action cannot give rise to an inference of retaliatory motive." *Strouss v Mich. Dep't. of Corr.*, 250 F. 3d 336, 344, 346 (6th Cir. 2001). For

example, there was no causal connection where the plaintiff allegedly opposed sexual harassment, then allegedly suffered adverse action three years later. *Id.*

I. **Edward Ross's claim against Chief Hullinger fails because he has no First Amendment right to run for office and his termination had nothing to do with Edward Ross's alleged protected speech.**

Ross seeks liability against Chief Hullinger based on two alleged adverse actions: (1) the July 24, 2023 Letter and (2) the May 1, 2024 letter. Both theories fail.

a. **Edward Ross cannot establish a claim related to his first run for office because running for office is not protected by the First Amendment, nor did Edward Ross suffer any termination or other adverse action when he ran for office the first time.**

Ross cannot maintain a First Amendment Retaliation claim based on the July 24, 2023 letter. The letter indicates that "Per our department Political Activity policy, 104.07, fire department members shall NOT seek, be elected to, or hold any elective position within the government of the City of Troy." (Ex. 15 – 7/24/2023 Letter). This comment does not violate the First Amendment because *Carver, supra* found that running for office is not protected activity under the First Amendment.

Secondly, Ross was not terminated from his position when he decided to run for office. He only received a letter. Thus, he did not suffer an adverse action when he ran for office the first time.

Third, Ross will argue that this letter was sent because of comments he made opposing the changes in the firefighter incentive plan. This argument fails because there is no causal connection between Ross's opposition to the City changing its firefighter

incentive plan and this letter. The letter very explicitly identifies that Chief Hullinger was merely enforcing a City policy that *Carver, supra* states was constitutional. Even if the comments were somehow related to the letter, Ross's complaints about the incentive plan changes are personal in nature (not of public concern), like complaints regarding overtime and retirement benefits. *Gragg, supra; Van Compernolle, supra.*

Further, Chief Hullinger is entitled to qualified immunity. Ross does not have a clearly established First Amendment right to run for political office. There is no authority that suggests Chief Hullinger engaged in adverse action, under the First Amendment, by sending Ross a letter advising Ross that he violated a constitutionally sound policy. Even assuming Ross connected his opposition to the incentive plan to the letter, there is no authority suggesting his speech bore on a matter of public concern. Chief Hullinger is entitled to qualified immunity for his first letter.

**b. Edward Ross's claim relating to his second run for City Council fails because there is no First Amendment right to run for office and his termination was unrelated to any protected speech.**

The Court should dismiss the claim that Ross's First Amendment rights were violated regarding the second candidacy, as well. Again, he had no constitutional right to run for office, which is fatal to this claim. *Carver, supra.*

Ross will argue that he was really terminated for his opposition to the City's change in the incentive plan, but there is no causal connection between the termination and those instances. The City enforced a constitutionally valid policy. Furthermore, Chief Hullinger took into consideration more than Ross's blatant violation of the City's

policy regarding running for office. Ross had been part of a fire academy class that had several issues, had recently had an altercation with another firefighter, which almost came to blows and he demonstrated his insubordination when he blasted off an email to the entire Fire Department regarding his opposition to the City's change in policy, instead of using the usual method of opposing the issue through the chain-of-command. (Ex. 6 – Hullinger, p 48, 50, 67-68, 86-87, 95). The fact that Ross's opposition to the incentive plan occurred over a year prior to his candidacy also demonstrates that Ross's comments were not related to his termination. *Strouss*. Further, his comments were not matters of public concern, so it is irrelevant whether there is a causal connection between those and his termination.

Ross may also argue that his termination was due to his email to the entire department opposing the update to the political activity policy. However, that email was not a matter of public concern; it was merely an employee beef with the policy. *Bagi*, *supra*; *Golembiewski*, *supra*. Given that the Fire Department operates in a paramilitary structure, Chief Hullinger had a legitimate concern that Ross's reply all email would undermine authority and destroy close working relationships. Indeed, he had learned from Ross's opposition to the incentive plan changes that Ross's actions undermined the authority of the incentive plan committee. (Ex. 6 – Hullinger Dep, p 65).

Additionally, Chief Hullinger should be entitled to qualified immunity as to this claim. Again, the law is not clearly established that running for office is protected by the First Amendment. Further, the undersigned has identified no Supreme Court or

Sixth Circuit authority suggesting that Chief Hullinger could not fire Ross for violating a constitutionally valid policy. There is no authority that indicates that Ross's comments opposing the incentive plan change or his email opposing the City's policy update amount to speaking on a matter of public concern. The Court should dismiss Chief Hullinger from this case.

## II. Former City Manager Mark Miller and Deputy City Manager Bob Bruner were not personally involved with the actions that Edward Ross claims were unconstitutional.

Ross's claim against Miller and Bruner also fails. They could be dismissed for the same reasons Chief Hullinger should be dismissed. They also were not personally involved in the decision to terminate Ross. Therefore, they did not violate Ross's rights, much less clearly so.

## III. The Official Capacity Claims should be dismissed as duplicative of the claims against the City.

Ross also sues the individual defendants in their "official capacities." (Complaint – R. 1, PageID. 1). An "official capacity" claim is just a duplicative way of bringing a § 1983 claim against a municipality. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Williams v. City of Saginaw*, No. 00-10241-BC, 2002 W.L. 1798907, at *13 (E.D. Mich. August 6, 2002). Here, the City is also named as a defendant, so the "official capacity" claims should be dismissed as duplicative of the claim against the City.

## LAW & ARGUMENT – THE CITY

**I.  Ross's claim against the City should be dismissed because its policies and procedures are constitutional – there is no First Amendment right to run for office.**

Ross contends the City is liable in this action because it had an unconstitutional policy, custom, or practice. (Complaint – ECF No. 1, PageID. 7). However, the § 1983 claim against the City fails as well.

A governmental entity cannot be held liable under a § 1983 claim solely because it employs a tortfeasor. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978). Rather, to bring a claim against a municipality, the plaintiff must demonstrate that an official policy or custom of the municipality was the moving force behind the deprivation of the plaintiff's constitutional rights. *Id.* An "official policy" refers to formal rules or understandings that are intended to establish fixed plans of action to be followed under similar circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). A key requirement of a *Monell* claim against a municipality is that the plaintiff must establish that he/she suffered a constitutional violation – failure to establish a constitutional violation is fatal the claim. *City of Los Angeles v. Heller*, 475 U.S. 796 (1986).

Here, Ross's claim against the City fails because none of the individual defendants violated the constitution, as demonstrated above.

Also, the policies Ross challenges are facially valid. Ross takes issue with the 2011 policy which states that "no active member of the fire department shall seek, be elected to, or hold any elective position within the government of the City of Troy." (Ex. 14 –

2011 Policy). He also takes issue with the City's 2024 policy which states that firefighters are prohibited from "filing/apply as a candidate for or holding elective City of Troy Municipal office" and that it "applies to all personnel during active status, inactive status, and 'on leave' status for whatever reason." Both these policies are consistent with *Carver*, *supra* and, therefore, comply with the First Amendment. The City should be dismissed.

## CONCLUSION

For the reasons set forth above, the Court should grant Summary Judgment in Defendants' favor.

Respectfully submitted,

ROSATI SCHULTZ JOPPICH &
AMTSBUECHLER, PC

/s/ Michael T. Berger
MICHAEL T. BERGER (P77143)
Attorneys for Defendants
27555 Executive Drive, Suite 250
Farmington Hills, MI 48331
(248) 489-4100 / Fax: (248) 489-1726
Date: January 30, 2026              mberger@rsjalaw.com

## CERTIFICATE OF SERVICE

I certify that on January 30, 2026, the foregoing document was filed through the CM/ECF system, which will electronically notify all parties and/or their counsel of such filing.

/s/ Michael T. Berger